**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| SEAN BAUER, GIOVANNI BROWN, ALEXIS CHAVEZ, TEDDY GORMAN, HAMPTON JENKINS, SARAH MIDGETT, PATRICK NORWOOD, JAMES ROMER, MICHAEL SALVO, DONAVAN SNOVEL, JAMES STEWERT, HOWARD THOMAS, IV, PAUL WATSON, and ALEX WILKINSON, | ) ) ) ) ) ) ) ) | |
| | ) | **ORDER** |
| Plaintiffs, | ) | |
| | ) | No. 2:21-cv-02952-DCN |
| vs. | ) ) | |
| R. KEITH SUMMEY, *in his official and individual capacities*, and CITY OF NORTH CHARLESTON, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| ————————————————— | ) | |
| | ) | |
| AARON GDOVICAK, ALEXANDER GLOVER, ANDREW LUPISELLA, BENJAMIN PASTVA, BRENDAN SCHECKER, BRICE MACK, CARL DAVID GRANT, CECILIA F. LEONE, CHRIS EDWARDS, CRAIG HAMILTON, DANA FLANIGAN, EDWARD MARSHALL ANDERSON, ERIC GLOVER, GERRY HARTER, HAYLEY BELL, JANE DOE, JOHN CHARLES PETRO, JOHN DANIEL JOHNSON, JOHN DOE FIREFIGHTER #1, JOHN DOE FIREFIGHTER #2, JOHN E. BAKER, JOHN MCDONALD, JONATHAN MASSIE, JOSH TURNER, JOSHAWA DANIEL BELL, JOSHUA COR, JUSTIN KAHLE, KATELYN BROGAN, KIP HIBBARD, KYLE GARY SKEELS, LOGAN FACE, MATTHEW BRENNAN, MATTHEW WILSON, MICHAEL FEDELE, RICHARD WALLS, RJ WALLS, ROBERT SACCO, ROBERT TACKETT, SCOTT DABNEY, THOMAS MCNAMARA, TODD MCCUMBEE, TRAVIS DOVERSPIKE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

1

VICTOR KRUZINSKY, and WILLIAM )
JAMES TOWNE, )
)
Plaintiffs, )
)
vs. )          No. 2:21-cv-03137-DCN
)
JOHN H. TECKLENBURG, *in his official* )
*and individual capacities*, and CITY OF )
CHARLESTON, )
)
Defendants. )
_____)
)
ASHLEIGH TUCKER, BLAKE ALVEY, )
CHRIS P. QUINN, DAVID JOHNSON, )
DENISE COBB, ELIZABETH MOFFAT, )
JANE DOE DISPATCHER, JEFFREY D. )
WATSON, JENNIFER SCIARROTTA, JOHN )
DOE DEPUTY #1, JOHN DOE DEPUTY #2, )
JOHN DOE DEPUTY #3, JONATHAN )
JOURDAN, LARRY DONALD HALL JR, )
MATTHEW HUTCHINSON, MCKENZIE )
EVERHAM, PAXTON CHEL HATCHELL )
PRETTEL, SHANNA MASCIA, STUART )
JOEY PRETTEL II, TIMOTHY JOSEPH )
CARROLL, DALE MCCANTS, JR., JOHN )
CHRISTOPHER ADAMS, DAVID )
JOHNSON, and RICKIE BIGGS, )
)
Plaintiffs, )
)
vs. )          No. 2:21-cv-03178-DCN
)
ANNA B. JOHNSON, *in her official and* )
*individual capacities*; HENRY E. DARBY, *in* )
*his official and individual capacities*; )
HERBERT RAVENEL SASS, III, *in his* )
*official and individual capacities*; KYLON )
JEROME MIDDLETON, *in his official and* )
*individual capacities*; ROBERT L. )
WEHRMAN, *in his official and individual* )
*capacities*; TEDDIE E. PRYOR, SR., *in his* )
*official and individual capacities*; and )
CHARLESTON COUNTY, )
)

2

|  |  |  |
|---|---|---|
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| CHRIS HERNDON, DAMON BEVINS, | ) | |
| DUSTIN KREINBROOK, JEREMEY | ) | |
| EARDLEY, JONATHAN FLANAGAN, | ) | |
| JOSEPH MARTIN, JUSTIN ELLIS, | ) | |
| KEVIN FRIZZELL, KODY CAPATOSTO, | ) | |
| MARK ORTIZ, RUSTY DEAN GROW, JR., | ) | |
| and TRAVIS A. MILLER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 2:21-cv-03192-DCN |
| | ) | |
| COLLEEN WALZ, *in her official and* | ) | |
| *individual capacities*; DEBRA LEHMAN, | ) | |
| *in her official and individual capacities*; | ) | |
| ERIC BRITTON, *in his official and individual* | ) | |
| *capacities*; FRANK J. BROCCOLO, *in his* | ) | |
| *official and individual capacities*; ISIAH | ) | |
| WHITE, *in his official and individual* | ) | |
| *capacities*; LEROY BLAKE, *in his official and* | ) | |
| *individual capacities*; MARY JONES, *in her* | ) | |
| *official and individual capacities*; ROBERT E. | ) | |
| WRIGHT, *in his official and individual* | ) | |
| *capacities*; STEPHEN ROLANDO, *in his* | ) | |
| *official and individual capacities*; and ST. | ) | |
| JOHN FIRE DISTRICT, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The following matter is before the court on the motions for preliminary injunctions filed by plaintiffs in each of the above-captioned cases. Because the facts and law underlying the four cases are almost identical, the parties have agreed to consolidate the cases for the purpose of the court's resolution of the motions for preliminary injunctions. For the reasons set forth below, the court denies the motions.

# I.  BACKGROUND

This matter arises out of certain policies issued by the City of North Charleston, the City of Charleston, the County of Charleston, and the St. John Fire District imposing mandatory COVID-19 vaccine requirements on their employees and other affiliated personnel.  Plaintiffs in each of the above-captioned actions filed suit against the respective government entities by whom they are employed or affiliated, challenging the COVID-19 vaccine mandates as violative of their rights under the United States and South Carolina Constitutions and under certain South Carolina statutes and common law. The court provides a brief summary of each of the challenged policies below.

## A.  The City of North Charleston Executive Order

On September 1, 2021, Mayor R. Keith Summey ("Mayor Summey"), in his capacity as the City of North Charleston's chief executive, signed and issued Executive Order Number 2021-0001 (the "Executive Order").  The Executive Order imposes a mandatory COVID-19 vaccine requirement on all City of North Charleston employees, volunteers, and interns, whether working on a full or part-time schedule.  The Executive Order mandates that compliance is a condition of continued employment and sets the compliance date as November 5, 2021.  A new policy implementing the Executive Order was published to all employees.  That policy requires that all employees be fully vaccinated or have submitted a request for an exemption by November 5, 2021.  The policy provides a process by which employees can request an exemption based on medical need or religious objection, and it provides for temporary deferral of the vaccine mandate for any employee on extended leave, including under the Family and Medical

4

Leave Act or military leave, at the time of the effective date, and under other specified circumstances.

Certain volunteers, vendors, and personnel affiliated with or employed by the City of North Charleston (collectively, the "North Charleston plaintiffs")[1] filed for administrative exemptions from the mandate. The North Charleston plaintiffs claim that no individual plaintiff's request has been approved. The North Charleston plaintiffs filed the instant lawsuit and request for injunctive relief against the City of North Charleston and Mayor Summey (collectively, the "North Charleston defendants") in the Charleston County Court of Common Pleas on September 13, 2021. On September 14, 2021, the North Charleston defendants removed the action to this court. Bauer v. Summey, No. 2:21-cv-02952-DCN (D.S.C. 2021) ("Bauer"), ECF No. 1. On September 14, 2021, the

---

[1] The plaintiffs originally named in the action work either in the City of North Charleston's police or fire departments. In the amended complaint, certain vendors and first responders were also named as plaintiffs. Specifically, the amended complaint includes two plaintiffs who serve as vendors at the City of North Charleston's farmer's market. The parties agree that, on its face, the Executive Order does not apply to these vendors. Plaintiffs argue that the City of North Charleston is nevertheless attempting to enforce the Executive Order against the vendor plaintiffs. The court need not resolve this issue at this time. The parties agree that the Executive Order undoubtedly applies to the employee plaintiffs, meaning these parties have standing to challenge the Executive Order and the court may properly consider their motion to enjoin that order at this time. If the Executive Order is indeed inapplicable to vendors, then the court's resolution of the motion to enjoin enforcement of that order will not affect those vendors. If the Executive Order ultimately applies to vendors, the court's resolution of the motion to enjoin enforcement of the order will apply equally to vendors as other employees and affected personnel. Indeed, the vendor plaintiffs do not present any individualized arguments that the Executive Order is specifically unenforceable against them apart from the arguments presented by employee plaintiffs. In any event, counsel for the City of North Charleston represented that the farmer's market will close for the season before the effective date of the Executive Order. Therefore, these vendors will not be immediately subject to the vaccine mandate, mooting the need for a preliminary injunction as to these plaintiffs at this time. The same analysis applies to vendor plaintiffs in the other above-captioned actions, along with any other plaintiffs in these actions who may not necessarily be subject to the vaccine mandates at issue.

North Charleston plaintiffs filed a motion for a preliminary injunction. Bauer, ECF No. 4. On September 24, 2021, the North Charleston defendants responded in opposition, Bauer, ECF No. 14, and on October 5, 2021, the North Charleston plaintiffs replied. Bauer, ECF No. 17.

### B. The City of Charleston Personnel Policy

On September 3, 2021, the City of Charleston announced the adoption of a new personnel policy imposing a mandatory COVID-19 vaccine requirement on all employees, volunteers, interns, and agency temporary employees of the City of Charleston, whether working on a full or part-time schedule. The policy mandates that compliance is a condition of continued employment and sets the compliance date as no later than November 22, 2021. The policy was published to all employees and requires that all employees be fully vaccinated or have submitted a request for exemption by November 22, 2021. The policy provides a process by which employees can request an exemption based on medical need or religious objection, and it provides for temporary deferral for any employee on extended leave at the time of the effective date and under other specified circumstances.

Certain individuals allegedly subject to the City of Charleston's personnel policy (the "Charleston plaintiffs")[2] filed for administrative exemptions from the mandate. The

---

[2] The named Charleston plaintiffs, with the exception of plaintiff Cecilia Leone, are employees of the City of Charleston who oppose its COVID-19 vaccine mandate. Plaintiff Leone alleges that she is a vendor with the City of Charleston. The Charleston defendants complain that plaintiff Leone is not subject to the City of Charleston's personnel policy and therefore lacks standing to challenge that policy. Moreover, defendants complain that three of the plaintiffs improperly joined the action anonymously under "Jane" and "John Doe" status. Again, because the Charleston plaintiffs who are employees undoubtedly have standing, the court may resolve the motion for preliminary injunction and need not resolve the issues raised as to the other plaintiffs at this time.

Charleston plaintiffs claim that no individual plaintiff's request has been approved. The Charleston plaintiffs filed suit against the City of Charleston and its mayor, John H. Tecklenberg, (together, the "Charleston defendants") on September 23, 2021 in the Charleston County Court of Common Pleas. Subsequently, the Charleston defendants removed the case to this court on September 27, 2021. Gdovicak v. Tecklenburg, No. 2:21-cv-03137-DCN (D.S.C. 2021) ("Gdovicak"), ECF No. 2. The Charleston plaintiffs filed their motion for preliminary injunction on September 30, 2021. Gdovicak, ECF No. 6. On October 13, 2021, the Charleston defendants responded in opposition, Gdovicak, ECF No. 7, and on October 14, 2021, the Charleston plaintiffs replied, Gdovicak, ECF No. 8.

### C. County of Charleston Personnel Policy

On September 16, 2021, the County of Charleston (the "County") announced the adoption of a new personnel policy requiring that all employees, volunteers, interns, contracted employees, and agency temporary employees of the Charleston County Government be fully vaccinated against COVID-19 no later than November 7, 2021. The new policy was published to all employees. The policy excludes employees of elected or appointed officials except those choosing to adopt and enforce the policy and does not apply to vendors other than those who provide temporary staff or on-site workers. The policy provides a process by which employees can request an exemption for medical or religious reasons, and it provides for temporary deferral for any employee on extended leave at the time of the effective date and under other specified circumstances.

Certain employees, vendors, and sheriff's deputies (the "County plaintiffs")[3] filed

for administrative exemptions from the mandate.  The County plaintiffs claim that no

individual plaintiff's request has been approved.  The County plaintiffs filed suit against

the County and certain County Council members (the "County defendants") on

September 24, 2021 in the Charleston County Court of Common Pleas.  The County

defendants removed the case to this court on October 1, 2021.  <u>Tucker v. Johnson</u>, No.

2:21-cv-03178-DCN (D.S.C. 2021) ("<u>Tucker</u>"), ECF No. 2.  On September 30, 2021, the

County plaintiffs filed their motion for a preliminary temporary injunction.  <u>Tucker</u>, ECF

No. 3.  On October 5, 2021, the County defendants responded in opposition, <u>Tucker</u>, ECF

No. 7, and on October 11, 2021, the County plaintiffs replied, <u>Tucker</u>, ECF No. 9.

### D.  St. John Fire District Personnel Policy

On September 7, 2021, the St. John Fire District (the "District") announced the

adoption of a new personnel policy requiring that all District employees be fully

vaccinated against COVID-19 no later than November 20, 2021.  The new policy was

published to all employees.  The policy provides a process by which employees can

request an exemption for medical or religious reasons, and it provides for temporary

deferral for any employee on extended leave at the time of the effective date and under

other specified circumstances.

---

[3] The court does not address defendants' standing challenge to the sheriff's deputy plaintiffs at this time.  Defendants argue that the sheriff's deputy plaintiffs lack standing because the County has no authority to create policies that control them, as they are not County employees.  However, the parties do not dispute that the plaintiffs employed by the County have standing to challenge the County's personnel policy and vaccine mandate therein, and therefore the court may properly resolve the instant motion for preliminary injunction whether or not the sheriff's deputies also have standing.

After publication of the policy, certain firefighters employed by the District (the "District plaintiffs") filed for administrative exemptions from the mandate. The District plaintiffs claim that no individual plaintiff's request has been approved. The District plaintiffs filed suit against the District, the Chief of the District, and members of the District's appointed commission (collectively, the "District defendants") on September 23, 2021 in the Charleston County Court of Common Pleas. The District defendants removed the case to this court on September 30, 2021. Herndon v. Walz, No. 2:21-cv-03192-DCN (D.S.C. 2021) ("Herndon"), ECF No. 2. On September 30, 2021, the District plaintiffs filed a motion for a preliminary temporary injunction. Herndon, ECF No. 3. On October 8 and 14, 2021, the District defendants responded in opposition, Herndon, ECF Nos. 17 and 20, and on October 13 and 15, 2021, the District plaintiffs replied, Herndon, ECF Nos. 19 and 21.

The court held a hearing on the North Charleston, Charleston, County, and District plaintiffs' (collectively, "plaintiffs") motions for preliminary injunction in all four above-captioned cases on October 14, 2021. As such, the motions are now ripe for review.

## II. STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." United States v. South Carolina, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)). "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his

favor, and [4] that an injunction is in the public interest." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008). "To obtain a preliminary injunction under the <u>Winter</u> test, a movant must make a 'clear showing' of [the] four requirements." <u>Alkebulanyahh v. Nettles</u>, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011); <u>see also</u> <u>Dewhurst v. Century Aluminum Co.</u>, 649 F.3d 287, 290 (4th Cir. 2011) ("<u>Winter</u> thus requires that a party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits.") (internal quotation marks omitted). As the Supreme Court has noted, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Winter</u>, 555 U.S. at 22.

### III.   DISCUSSION

Plaintiffs seek a preliminary injunction to preserve the status quo during the pendency of the litigation of all four cases. Specifically, plaintiffs request injunctions prohibiting the North Charleston, Charleston, County, and District defendants (collectively, "defendants") from enforcing their respective policies (the "Policies"), and particularly the COVID-19 vaccine mandates therein, against plaintiffs and similarly situated individuals until this action can be resolved on the merits. For such an injunction to issue, plaintiffs must make a clear showing as to each of prong of the <u>Winter</u> test. The court discusses each prong in turn.

#### A.  Likelihood of Success on the Merits

Plaintiffs base their injunction requests on their allegations that the Policies violate the United States Constitution and South Carolina statutory and common law. Therefore, for an injunction to issue, plaintiffs must make a clear showing that they are

likely to succeed on the merits of those claims.  See Winter, 555 U.S. at 20; Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013) (internal citations omitted).

As an initial matter, the motions for preliminary injunction are little more than a recitation of the allegations in the complaint, without an overview of the law underlying plaintiffs' claims or application of the facts to that law.  As such, defendants were left to prognosticate the arguments that plaintiffs intended to make under each of their claims and preemptively rebut those arguments in their responses.  Plaintiffs do little in their replies to clarify the issues and applicable legal framework, but, instead, further complicate the motions by consistently conflating their claims and reciting various legal buzz words and catch phrases without explaining how those principles apply to the instant actions.  The merits of plaintiffs' claims, as best as they can be construed, are addressed in turn below.

### 1.  Constitutional Claims

Plaintiffs allege that the Policies violate the United States Constitution's guarantee of due process, equal protection, and free exercise of religion.  Under 42 U.S.C. § 1983, an individual may sue a municipality for constitutional violations caused by a government "policy or custom."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  Section 1983 further allows an individual to bring a civil action against a government official who infringes on a constitutionally protected right.  Elrod v. Burns, 427 U.S. 347, 359 (1976).  Nevertheless, the court finds that none of the alleged constitutional violations warrant enjoining the Policies.

11

### a.  Due Process

Plaintiffs claim that the Policies, and specifically their conditioning of plaintiffs' employment on their receipt of the COVID-19 vaccine, violate their procedural and substantive due process rights under the Fourteenth Amendment to the United States Constitution.  The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV. The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See City of Sacramento v. Lewis, 523 U.S. 833, 845–46 (1998).

Procedural and substantive due process claims require different showings.  Under procedural due process, "protection of property is a safeguard of the security interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 576 (1972).  "It is a guarantee of fair procedures, typically notice and an opportunity to be heard."  Mora v. City of Gaithersburg, 519 F.3d 216, 230 (4th Cir. 2008) (quotations omitted).  In contrast, substantive due process "is a far narrower concept than procedural; it is an absolute check on certain government actions notwithstanding the fairness of the procedures used to implement them."  Roth, 408 U.S. at 576 (citing Love v. Pepersack, 47 F.3d 120, 122 (4th Cir. 1995)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008).

**i. Procedural Due Process**

Plaintiffs allege in their motions that the Policies "deprive[] Plaintiffs of their property interest in their jobs . . . without due process." Bauer, ECF No. 4 at 6. The court construes these allegations as procedural due process claims. To demonstrate a procedural due process violation, a plaintiff must show that he or she has a constitutionally protected property or liberty interest, and that he or she was deprived of that interest by the state without due process of law. Roth, 408 U.S. at 564; Tri Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 436 (4th Cir. 2002). Thus, as a threshold issue, to establish a procedural due process claim, plaintiffs must have a property interest in their continued employment with the respective governmental entities.

A property interest exists when one has a legitimate claim of entitlement to a right arising from such sources as state statutes, local ordinances, and employment contracts. Roth, 408 U.S. at 577. The Supreme Court has stated that in order to possess a property interest in one's employment, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id. The Supreme Court also has held that although a property interest in employment can be created by statute, ordinance, or express or implied contract, "the sufficiency of the claim of entitlement must be decided by reference to state law." Bishop v. Wood, 426 U.S. 341, 344 (1976). South Carolina has long recognized the doctrine of at-will employment. "An at-will employee may be terminated at any time for any reason or for no reason, with or without cause." McNeil v. S.C. Dep't. of Corrections, 743 S.E.2d 843 (S.C. Ct. App. 2013). The "Fourth Circuit has repeatedly made it clear that at-will employees lack an enforceable expectation of

continued employment (i.e., a property interest) and, consequently, cannot maintain a claim under Section 1983 for violation of due process under the fourteenth amendment based on their employment discharge." Williams v. Strickland, 1993 WL 153915, at *4 (D.S.C. Mar. 12, 1993) (counting cases); see Pittman v. Wilson Cnty., 839 F.2d 225, 229 (4th Cir. 1988) (holding that an at-will employee does not have a property interest in his position of employment); Thompson v. Richland Cnty. Sch. Dist. One, 2018 WL 2676159, at *6 (D.S.C. June 5, 2018) (applying South Carolina law and finding that because plaintiff "fail[ed] to identify any employment policy or mutually explicit understanding that would support a claim of entitlement to her employment . . . she is unable to assert any property interest in her continued employment with the District sufficient to state a claim for a violation of her due process rights"); Hamilton v. Bd. of Trs. of Oconee Cnty. Sch. Dist., 319 S.E.2d 717, 721 (S.C. Ct. App. 1984) (finding no property interest in plaintiff's continued employment within the meaning of the due process clause when the plaintiff "pointed to no state law or regulation that would require her employment contract to be renewed"); Nkwocha v. S.C. State Univ., 2014 WL 1278006, at *8 (D.S.C. 2014) (finding that a non-tenured, at-will employee employed pursuant to a series of written contracts detailing employment for a fixed time period and serving at the pleasure of the president did not have a constitutionally-protected property interest in continued employment).

Defendants have presented to the court various signed documents whereby individual plaintiffs expressly acknowledged the at-will status of their employment, and plaintiffs do not challenge the authenticity of these documents or otherwise dispute that

plaintiffs are all employed at-will. See, e.g., Bauer, ECF No. 14-1.[4] Rather, plaintiffs argue that South Carolina's "public policy exception to at-will employment" applies. Bauer, ECF No. 17 at 12. Specifically, plaintiffs argue that the South Carolina Supreme Court recognizes a public policy that people should not be fired for their political beliefs. Bauer, ECF No. 17 at 13 (citing Culler v. Blue Ridge Elec. Coop., Inc., 422 S.E.2d 91, 93 (S.C. 1992)). Plaintiffs explain that they believe "that the right to control their own medical destinies is both expressive speech in the form of opposition to the COVID-19 vaccine, and expressive conduct in opposition to the vaccine mandate." Bauer, ECF No. 4 at 3. Plaintiffs argue that they "have made it very clear they do not intend to get the COVID vaccine, they do not agree with it politically, and believe it is their inherent right protected by the constitution to refuse it." Bauer, ECF No. 17 at 9–10.

South Carolina law does indeed recognize an exception to employment-at-will status where an employee is discharged in contravention of South Carolina public policy. See Epps v. Clarendon Co., 405 S.E.2d 386, 387 (S.C. 1991). However, the fact that the public policy exception creates a right of action in certain limited circumstances does not, by itself, mean that employees discharged for reasons that violate public policy are given a property right in their employment. See Beck v. City of Durham, 129 F. Supp. 2d 844, 850–51 (M.D.N.C. 2000). The court does not find—and plaintiffs do not cite—any authority under South Carolina law that stands for the proposition that South Carolina public policy creates property rights in employment. In the absence of such authority, the court will not expand upon the meaning of the public policy exception to

---

[4] Because the parties' briefings on the motions for preliminary injunction in each case are effectively the same in all material respects, the court references only the Bauer briefings in its discussion.

employment-at-will status under South Carolina law.  In any event, as explained more thoroughly in connection with plaintiffs' wrongful discharge claims, plaintiffs fail to make a clear showing that the public policy exception applies in these actions.  Therefore, because plaintiffs have not made a clear showing that they have a property interest in continued employment, they have not shown likelihood of success on the merits of their procedural due process claim.

Even if plaintiffs could establish a property interest in their employment, they must also establish that defendants deprived them of due process in infringing on that interest.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985) (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)) ("[O]nce it is determined that the Due Process Clause applies, the question remains what process is due.").  Plaintiffs fail to explain how defendants' processes for implementing the Policies were defective. This failure provides an alternative, independent ground for finding that plaintiffs did not make a clear showing of likelihood of success on their procedural due process claims.

"An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Id. at 542 (internal quotation marks and citation omitted).  However, an individual's due process rights are not violated by a law of general applicability since "the legislative determination provides all the process that is due." Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982).  During the hearing, counsel for defendants classified the City of North Charleston Executive Order as an executive act and the City of Charleston, County, and District personnel policies as legislative acts.  Counsel for plaintiffs did not object to these classifications.  Nevertheless, the court finds that the

Executive Order is also legislative in nature because it is "attempting through policy, to achieve a stated government purpose," rather than adjudicate disputed facts of a particular case. ETP Rio Rancho Park, LLC v. Grisham, 522 F. Supp. 3d 966, 1028–29 (D.N.M. 2021) (explaining that although a State executive agency issued the public health order at issue, that order is "akin to a legislative action."); see Interport Pilots Agency Inc. v. Sammis, 14 F.3d 133, 142 (2d Cir. 1994) ("Official action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause. These constitutional due process requirements apply only where the official action is designed to adjudicate disputed facts in particular cases." (internal quotation marks and citation omitted)); Abdi v. Wray, 942 F.3d 1019, 1027 (10th Cir. 2019) (finding a directive by the attorney general akin to legislative action because it was not the specific act of a governmental officer, but rather the concerted action of several agency employees). Accordingly, the Policies do not violate plaintiffs' due process rights if they are of general applicability. See United States v. Locke, 471 U.S. 84, 108 (1985) ("In altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements."); Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enf't Comm'n, 889 F.2d 929, 936 (10th Cir. 1989) ("When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process."); Curlott v. Campbell, 598 F.2d 1175, 1181 (9th Cir. 1979) ("[W]e doubt very much that procedural

due process prior to reduction of benefits is required when an agency makes a broadly applicable, legislative-type decision.").

At least one district court reviewing a property interest claim in the context of an employer-imposed COVID-19 vaccine mandate has held that the employees received all the process to which they were entitled when the prospective rule—which applied to all employees, albeit with certain exemptions—was implemented and published to the plaintiffs. See Valdez v. Grisham, 2021 WL 4145746, at *9 (D.N.M. Sept. 13, 2021) (explaining that because a public health order was "generally applicable" to all congregate care facility workers, hospital workers, school workers, state fair attendees, and governor's office staff, the plaintiffs were "not entitled to [process] above and beyond the notice provided by the enactment and publication of the [order] itself"). Here, plaintiffs do not dispute whether the Policies were published to all plaintiffs. Moreover, because all employees of defendants are subject to the same vaccine mandate and exemptions, the Policies most likely would be considered generally applicable. Therefore, plaintiffs have not clearly shown, and indeed have not argued, that they are entitled to any greater process beyond the notice and enactment of the Policies.

Additionally, at least one court has found that the state provided due process where state law permitted the plaintiff to file suit to challenge the legality of an administrative order before a court of law. See SH3 Health Consulting, LLC v. Page, 459 F. Supp. 3d 1212, 1226 (E.D. Mo. 2020) (finding no procedural due process violation because Missouri law provided a means for judicial review of an administrative order for illegality). Plaintiffs clearly have a similar opportunity to challenge the legality of the Policies and are fully taking advantage of that opportunity by pursuing the instant actions.

Overall, based on the foregoing, the court finds that plaintiffs have not clearly shown that they are likely to prevail on their procedural due process claim.

### ii. Substantive Due Process

Plaintiffs also allege that the Policies violate their substantive due process rights. Plaintiffs generally argue that they have constitutionally protected liberty interests in their "bodily integrity, privacy, and constitutional protections just to name a few." Bauer, ECF No. 17 at 8. Plaintiffs further argue that, because the Policies are "not narrowly tailored" to any "compelling interest," they violate these substantive due process rights. Id. at 8–9.

Substantive due process rights are much more limited in scope than procedural due process rights. For substantive due process to apply, governmental action must be "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protection or of adequate rectification by any post-deprivation state remedies." Rucker v. Harford Cnty., 946 F.2d 278, 281 (4th Cir. 1991), cert. denied, 502 U.S. 1097 (1992). Depending upon whether the claimed violation is by executive act or legislative enactment, different methods of judicial analysis are appropriate. Hawkins v. Freeman, 195 F.3d 732, 738–39 (4th Cir. 1999); see Lewis, 523 U.S. at 845–50. This is so because there are different "criteria" for determining whether executive acts and legislative enactments are "fatally arbitrary," an essential element of any substantive due process claim. Hawkins, 195 F.3d at 738–39.

In executive act cases, the issue of fatal arbitrariness should be addressed as a "threshold question," asking whether the challenged conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. at 738

19

(internal citation omitted).  If it does not meet that conscience-shocking test, the claim

fails on that account, with no need to inquire into the nature of the asserted liberty

interest.  If it does meet the threshold test of culpability, the inquiry must turn to the

nature of the asserted interest to determine the level of protection to which it is

entitled.  See id.

 If the claimed violation is by legislative enactment, the court's analysis proceeds

by a different two-step process that does not involve any threshold "conscience-

shocking" inquiry.  The first step in this process is to determine whether the claimed

violation involves one of "those fundamental rights and liberties which are, objectively,

'deeply rooted in this Nation's history and tradition,'" Washington v. Glucksberg, 521

U.S. 702, 720–21 (1997) (quoting Moore v. City of E. Cleveland, 431 U.S. 494, 503

(1977)), and "'implicit in the concept of ordered liberty,' such that 'neither liberty nor

justice would exist if they were sacrificed,'" id. (quoting Palko v. Connecticut, 302 U.S.

319, 325 (1937)).  The next step depends upon the result of the first.  If the asserted

interest has been determined to be "fundamental," it is entitled in the second step to the

protection of strict scrutiny judicial review of the challenged legislation.  See id. at 721

(quoting Reno v. Flores, 507 U.S. 292, 302 (1993)) (observing that fundamental liberty

interest is violated by legislation that infringes it unless the legislation is "'narrowly

tailored to serve a compelling state interest'").  If the interest is determined not to be

"fundamental," it is entitled only to the protection of rational-basis judicial

review.  See id. at 728.

 Critically, the "fundamental interest" inquiry must be conducted on the basis of a

"careful description of the asserted fundamental liberty interest."  Id. at 720 (quotation

omitted); see Hawkins, 195 F.3d at 738–39.  Such a careful description is necessary because the "Nation's history, legal traditions, and practices . . . provide the crucial 'guideposts for responsible decisionmaking,'" and these guideposts would be threatened by analyzing the claimed right at too general a level.  Glucksberg, 521 U.S. at 721–22 (quoting Collins, 503 U.S. at 125) (rejecting claimants' suggested description of their asserted right to assisted suicide as being one "to die," or "to choose how to die," or to "control one's final days," and instead analyzing right more narrowly as one "to commit suicide which itself includes a right to assistance in doing so").

        The parties do not argue in their briefs whether the Policies should be considered executive acts or legislative enactments.  However, as previously noted, counsel for defendants argued in the hearing that the court should treat the City of North Charleston's Executive Order as an executive act and the City of Charleston, County, and District's personnel policies as legislative acts, and counsel for plaintiffs did not dispute this proposed approach.  As also previously noted, precedent suggests that public health orders similar to the City of North Charleston's Executive Order are properly considered legislative enactments.  See, e.g., Valdez, 2021 WL 4145746, at *5–8 (finding that "plaintiffs advance a substantive due process challenge to a legislative enactment, namely, the [public health order]" (internal quotations omitted and emphasis in original)); Dias v. City & Cnty. of Denver, 567 F.3d 1169, 1182 (10th Cir. 2009); ETP Rio Rancho Park, 2021 WL 765364, at *41 (noting that "although the NMDOH—a state executive agency"—issued the challenged public health order, it was "akin to a legislative action").  Therefore, to avoid any doubt, the court addresses plaintiffs' challenge to the Policies under both the executive act "conscience-shocking" and

legislative enactment "fundamental interest" tests.  In so doing, the court finds plaintiffs

unlikely to prevail in establishing that the Policies violate their substantive due process

rights under either test.

First, the court finds that plaintiffs have not shown a likelihood of success on the

substantive due process claims under the shocks-the-conscience inquiry.  Even if the

executive act test applies to the Policies, defendants' actions do not violate the plaintiffs'

substantive due process rights because they do not shock the court's conscience.  See

Rochin v. California, 342 U.S. 165, 172 (1952); Schaefer v. Las Cruces Pub. Sch. Dist.,

716 F. Supp. 2d at 1059 n.2.  "Conduct that shocks the judicial conscience" is "deliberate

government action that is arbitrary and unrestrained by the established principles of

private right and distributive justice."  Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th

Cir. 2013).  The shocks-the-conscience standard is a high bar.  Cf. Rochin, 342 U.S. at

172 (finding that officers forcibly pumping suspect's stomach for morphine capsules

"shock[ed] the conscience").  "The behavior complained of must be egregious and

outrageous."  Hernandez, 734 F.3d at 1261 (citing Breithaupt v. Abram, 352 U.S. 432,

435 (1957)).

Plaintiffs do not attempt to argue that the Policies are so "egregious and

outrageous" that they shock the court's conscience.  Id.  Rightfully so.  The Policies'

implementation of a vaccine mandate to prevent the spread of a deadly virus among the

defendant governmental entities' employees and the citizens they serve does not rise to

the level of conscience-shocking.  See Herrin v. Reeves, 2020 WL 5748090, at *9 (N.D.

Miss. Sept. 25, 2020) ("[T]his court finds the notion that restrictions designed to save

human lives are 'conscious shocking' to be absurd and not worthy of serious

22

discussion."); Maniscalco v. N.Y.C. Dep't of Educ., 2021 WL 4344267, at *3 (E.D.N.Y.

Sept. 23, 2021) ("Although plaintiffs argue that there are other proven means of

preventing the spread of COVID-19 in schools, among them frequent testing and mask

wearing, it is not shocking for the City to conclude that vaccination is the best way to do

so, particularly at a time when viral transmission rates are high.").  Therefore, the court

cannot find that plaintiffs are likely to satisfy their burden of proving a substantive due

process violation under the conscience-shocking test.

　　　　Second, the court finds that plaintiffs fail to make a clear showing that they are

likely to succeed on their substantive due process claims under the fundamental interest

inquiry.  Specifically, plaintiffs fail to clearly show likelihood of success in establishing a

fundamental right at issue that has been recognized by courts or that is deeply rooted in

this nation's history and traditions and implicit in the concept of ordered liberty.

Plaintiffs' overly general characterization of the rights at issue as "bodily integrity" or

"privacy" falls short of the required "careful description" of the liberty interest.[5]

---

　　　　[5]  Plaintiffs also assert that the Policies infringe on their liberty interest in
declining unwanted medical treatment under Cruzan v. Director, Missouri Department of
Health, 497 U.S. 261, 278 (1990), Washington v. Harper, 494 U.S. 210 (1990), and King
v. Rubenstein, 825 F.3d 206, 222 (4th Cir. 2016).  Not only is this abstract
characterization of the liberty interest at issue too broad, but plaintiffs' reliance on these
cases is also misplaced.  Each of these cases involved inmates being forcibly injected or
forcibly given unwanted medical treatment.  Here, no plaintiff is imprisoned and facing
vaccination against his or her will.  Rather, plaintiffs are choosing whether to comply
with a condition of continued employment—employment for which they have not shown
that they possess a constitutionally protected interest in maintaining.  Moreover, the cases
on which plaintiffs rely involved an inmate's choice related to medical treatment "with
no ramifications to the physical health of others.  Vaccines address a collective enemy,
not just an individual one."  Klaassen v. Trs. of Ind. Univ. ("Klaassen I"), 2021 WL
3073926, at *22–26 (N.D. Ind. July 18, 2021); see Mass. Correction Officers Federated
Union v. Baker, 2021 WL 4822154, at *7 (D. Mass. Oct. 15, 2021) (finding the plaintiffs'
appeal to Cruzan misplaced because "Cruzan's holding . . . was limited to an individual's
choice related to the refusal of lifesaving medical care and nutrition, with no impact on

23

Glucksberg, 521 U.S. at 722.  Rather, a more appropriate description is plaintiffs' interest in continued employment with defendants while unvaccinated for COVID-19.  See Kheriaty v. Regents of the Univ. of Cal., 2021 WL 4714664, at *5 (C.D. Cal. Sept. 29, 2021) (rejecting the plaintiff's assertion that the a vaccine mandate infringed on a "fundamental right to bodily integrity" and instead considering the liberty interest at stake to be the plaintiff's interest in continuing employment while refusing a vaccine that protects him and the community at large from an infectious disease).  Under this more "careful description," plaintiffs' alleged violation does not involve a fundamental interest. Norris v. Stanley, 2021 WL 4738827, at *2 (W.D. Mich. Oct. 8, 2021) ("Although Plaintiff advocates that strict scrutiny should apply because [the university]'s vaccine policy violates her fundamental rights to privacy and bodily integrity under the Fourteenth Amendment, this argument is without merit.  Plaintiff is absolutely correct that she possesses those rights, but there is no fundamental right to decline a vaccination.").

Notably, the Supreme Court has expressly rejected the idea of a fundamental right to refuse vaccination.  In Jacobson v. Massachusetts, 197 U.S. 11, 26–27 (1905), the Supreme Court upheld a state law allowing cities and towns to implement vaccine mandates in order to contain smallpox outbreaks.  In so holding, the Supreme Court rejected an argument that liberty interests under the Fourteenth Amendment inevitably

---

the health of others or the public").  As such, the caselaw involving the refusal of medical treatment that plaintiffs rely on is inapposite to the instant action.  Moreover, the fact that courts overwhelmingly apply rational basis review to assess mandatory vaccination measures further undermines plaintiffs' argument.  Indeed, plaintiffs' appeal to these factually distinct cases and failure to cite a single vaccine mandate case that applied strict scrutiny is telling.

prevail in these circumstances.  Specifically, the Supreme Court stated, "We are unwilling to hold it to be an element in the liberty secured by the Constitution of the United States that one person, or a minority of persons, residing in any community and enjoying the benefits of its local government, should have the power thus to dominate the majority when supported in their action by the authority of the state."  Id.[6]

Since Jacobson, federal courts have consistently held that vaccine mandates do not implicate a fundamental right and, accordingly, applied rational basis review in determining the constitutionality of such mandates.  See, e.g., Klaassen v. Trs. of Ind. Univ. ("Klaassen II"), 7 F.4th 592 (7th Cir. 2021) (rejecting an assertion by the plaintiffs, who challenged Indiana University's mandatory COVID-19 vaccine requirement, that the rational basis standard does not offer enough protection for their interests, indicating that the court "must apply the law established by the Supreme Court" in Jacobson, which, in holding that "a state may require all members of the public to be vaccinated against smallpox," "shows that plaintiffs lack" a fundamental right to be free from mandatory vaccine measures); Klaassen I, 2021 WL 3073926, at *24 (collecting cases demonstrating "the consistent use of rational basis review to assess mandatory vaccination measures," and, in light of "a century's worth of rulings," declining to "extend substantive due

---

[6] Although some have questioned the present-day applicability of Jacobson because it predates formalized tiers of scrutiny, the Fourth Circuit has cited and relied upon it in an unpublished case as recently as 2011.  Workman v. Mingo Cnty. Bd. of Educ., 419 F. App'x. 348 (2011).  Moreover, counsel for both plaintiffs and defendants agreed during the hearing that Jacobson is still good law and applies to the instant actions.  It appears to the court that the majority of courts considering challenges to state and local COVID-19 restrictions have respected Jacobson's precedential value, and the court follows suit today.  See, e.g., M. Rae, Inc. v. Wolf, 2020 WL 7642596, at *6 (M.D. Pa. Dec. 23, 2020) ("The bottom line for our purposes is that Jacobson is controlling precedent until the Supreme Court or Third Circuit Court of Appeals tell us otherwise.").

process to recognize" a fundamental right to be free from COVID-19 vaccination

requirements); Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020)

(Gorsuch, J., concurring) (explaining that Jacobson is "essentially . . . rational basis

review"); Dixon v. De Blasio, 2021 WL 4750187, at *8 (E.D.N.Y. Oct. 12, 2021)

(rejecting the plaintiffs' appeal to the right to the "freedom of bodily health and integrity"

and explaining that the "right to refuse vaccination is not a fundamental right"); Harris v.

Univ. of Mass., 2021 WL 3848012, at *6 (D. Mass. Aug. 27, 2021) (in considering a

policy that required on-campus students to be COVID-19 vaccinated prior to the fall

semester, noting that "Fourteenth Amendment challenges to generally applicable public

health measures" call for a "deferential standard").

    These numerous holdings are consistent with well-settled law that a state,

including South Carolina, can require vaccination for school attendance.  See Zucht v.

King, 260 U.S. 174, 176 (1922); Workman, 419 F. App'x at 356 ("The Supreme Court

has consistently recognized that a state may constitutionally require school children to be

immunized."); see also S.C. Code Ann. § 44-29-10 et seq. (identifying communicable

diseases for which vaccination is required for school attendance in South Carolina).

Indeed, the right to work without a vaccine is far less compelling than the right for

children to attend school without a vaccine because the state requires children to attend

school.  Thus, the only option for those parents of children who do not qualify for

medical or religious waivers is to take on the significant cost and burden of home

schooling.  In contrast, an employee who objects to the Policies' vaccine mandate can

elect to work for another employer without such a policy or to work for himself.  The

court must be "'reluctant to expand the concept of substantive due process because

26

guideposts for responsible decision-making in this uncharted area are scarce and open-ended.'" <u>Glucksberg</u>, 521 U.S. at 720 (quoting <u>Collins v. Harker Heights</u>, 503 U.S. 115, 125 (1992)).  This means that courts must "exercise the utmost care whenever we are asked to break new ground in this field [] lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges]."  <u>Id.</u> (internal quotations and citations omitted); <u>see also</u> <u>Lewis</u>, 523 U.S. at 842 (noting the traditional reluctance of the Supreme Court to expand the concept of substantive due process).  In light of the caselaw regarding vaccine mandates and the reluctance of courts to expand the concept of substantive due process, the court finds that plaintiffs have not shown a likelihood of success in establishing that the Policies infringe on a fundamental right in the substantive due process analysis.

If plaintiffs fail to clearly show that the Policies infringe on a fundamental right, the court applies only rational basis review, rather than strict scrutiny.  <u>See</u> <u>Dixon</u>, 2021 WL 4750187, at *8–9 (internal quotations omitted) ("Because the right to refuse vaccination is not a fundamental right, <u>Jacobson</u> essentially applied rational basis review—which is exactly what the Court does today.").  In other words, the Policies need not be narrowly tailored to a compelling government interest.  Rather, they must only bear a rational relationship to a legitimate government interest.  Rational basis review "is highly deferential toward the government's actions.  The burden is on the plaintiff to show the governmental act complained of does not further a legitimate state purpose by rational means."  <u>Seegmiller v. LaVerkin City</u>, 528 F.3d 762, 772 (10th Cir. 2008).  Under rational basis review, a governmental policy "need not be in every respect logically consistent with its aims to be constitutional.  It is enough that there is an evil at

hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." Williamson v. Lee Optical of Okla. Inc., 348 U.S. 483, 487–88 (1955). Moreover, "[u]nder this test," defendants' "action 'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer, 814 F. App'x 125, 128 (6th Cir. 2020) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993)). Additionally, defendants need not "actually articulate at any time the purpose or rationale supporting" the Policies or vaccine mandates thereunder. Nordlinger v. Hahn, 505 U.S. 1, 11 (1992).[7] The government's decision "must be upheld if any state of facts either known or which could reasonably be assumed affords support for it. Second-guessing by a court is not allowed." Powers v. Harris, 379 F.3d 1208, 1216-17 (10th Cir. 2004).

Plaintiffs have not clearly shown that the Policies fail to pass muster under rational basis review. Defendants have provided several rational justifications for the Policies. These include, inter alia, the health concerns to government employees and citizens posed by COVID-19, the continued workforce disruption caused by the spread of COVID-19—particularly among unvaccinated employees, and the financial burden of implementing safeguards to counteract these risks. The Supreme Court has recognized that "[s]temming the spread of COVID-19 is unquestionably a compelling interest." Roman Cath. Diocese of Brooklyn, 141 S. Ct. at 67; see Cruzan, 497 U.S. at 261 (finding that the defendants had a legitimate interest in the "protection and preservation of human

---

[7] In this respect, plaintiffs' argument that the stated purpose of the Policies is only governmental efficiency—and the Policies do not explicitly state any public health interest in curbing the spread of COVID-19—is immaterial to the court's review.

life").  As of October 18, 2021, the Centers for Disease Control and Prevention ("CDC")

reports that there have been 44,801,768 identified cases of COVID-19 in this country,

resulting in 722,212 deaths.  CDC, <u>COVID Data Tracker</u>, https://covid.cdc.gov/covid-

data-tracker/ (last visited October 18, 2021).  Unlike the first several uncertain months

after COVID-19's discovery, state and local officials have since acquired more

knowledge and equipped themselves with better tools to reduce viral transmission.  Of

these new tools, the most highly regarded is vaccination.  The vaccines met the Food and

Drug Administration's ("FDA") rigorous scientific standards for safety, effectiveness,

and manufacturing quality needed to support approval or authorization of a vaccine.  The

FDA approved the Pfizer-BioNTech vaccine for individuals 16 years of age and older,

after reviewing data that supported the conclusion that the vaccine was both safe and

effective.  FDA.GOV, <u>FDA Approves First COVID-19 Vaccine</u> (Aug. 23, 2021),

https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-

vaccine.  Two additional vaccines, including a traditional viral vector vaccine developed

by Johnson & Johnson, have been made available under FDA emergency use

authorization, as has the Pfizer-BioNTech vaccine for individuals 12 through 15 years of

age.  Over 403 million doses of COVID-19 vaccine have been given in the United States

from December 14, 2020, through October 12, 2021.  CDC, <u>Safety of COVID-19</u>

<u>Vaccines</u>, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-

vaccines.html (last visited Oct. 12, 2021).  In light of these circumstances, numerous

courts have recognized that preventing the spread of COVID-19 provides a rational

justification for vaccine mandates.  <u>See</u> <u>Dixon</u>, 2021 WL 4750187, at *5 (finding that the

rise of the COVID-19 Delta variant, the potential for the disease to overwhelm healthcare

infrastructure, and the increased prevalence of breakout cases provide rational

justifications for a vaccine mandate); Klaassen I, 2021 WL 3073926, at *27 (noting that,

in light of the fact that the "vaccination campaign has markedly curbed the pandemic,"

"Indiana University insisting on vaccinations for its campus communities," thereby

"stemming illness, hospitalizations, or deaths at the university level[,] hardly proves

irrational"); Harris, 2021 WL 3848012, at *6 (holding that a university's decision to

mandate vaccines was based "upon both medical and scientific evidence and research and

guidance, and thus is at least rationally related to" the "legitimate interests" of curbing

the spread of COVID-19 and "returning students safely to campus"); America's Frontline

Doctors v. Wilcox, 2021 WL 4546923, at *3–5 (C.D. Cal. July 30, 2021) (holding that

"there is clearly a rational basis for Defendants to institute the Policy requiring

vaccination" to further the goal of facilitating the "protection of the health and safety of

the University community," where the policy was "the product of consultation with UC

infections disease experts and ongoing review of evidence from medical studies

concerning the dangerousness of COVID-19 and emerging variants of concern, as well as

the safety and effectiveness of the vaccines").  Rational basis review is a relatively low

bar, and in light of the aforementioned justifications, plaintiffs fail to show that the

Policies are unlikely to survive such review.[8]  Therefore, plaintiffs cannot show

likelihood of success on their substantive due process claims.

---

[8] Even if the court were to review the Policies under strict scrutiny, the court finds
that plaintiffs have not clearly shown that the Policies are unlikely to withstand such
scrutiny.  Again, the Supreme Court recognizes a compelling interest in stemming the
spread of COVID-19.  Roman Cath. Diocese of Brooklyn, 141 S. Ct. at 67.  The court is
satisfied that the Policies are narrowly tailored to that compelling interest.  As counsel for
defendants explained, defendants—like other employers and local and state governments
across the country—employed a variety of measures since the beginning of the pandemic

### b. Equal Protection

Plaintiffs next allege that defendants violated their equal protection rights under the Fourteenth Amendment by implementing the Policies. An equal protection claim arises when, without adequate justification, similarly-situated persons are treated differently by a governmental entity. U.S. Const. amend XIV. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, (4th Cir. 2001). When the distinction is based on a "suspect classification," the constitutional scrutiny sharpens in focus to determine whether the classification is narrowly tailored to serve a compelling governmental interest." See Plyler v. Doe, 457 U.S. 202, 216–17 (1982). When a plaintiff is not a member of a suspect class, he must prove that the distinction between himself and others similarly situated was not reasonably related to some legitimate governmental purpose. See Turner v. Safley, 482 U.S. 78, 89 (1987).

Plaintiffs argue that the Policies violate plaintiffs' rights to equal protection because they treat vaccinated persons differently than unvaccinated persons, including those who have natural immunity. Specifically, plaintiffs argue that unvaccinated

---

to stem the spread of COVID-19. Such efforts included granting employees leave with pay under quarantine measures, reopening operations in shifts, implementing distancing and masking requirements, and, finally, encouraging voluntary vaccination. The fact that South Carolina continues to experience a "high" rate of transmission despite these efforts supports a conclusion that the vaccine mandates in the Policies are narrowly tailored, and plaintiffs have not made a clear showing to the contrary. HealthData.gov, COVID-19 State Profile Report – South Carolina, https://healthdata.gov/Community/COVID-19-State-Profile-Report-South-Carolina/jw8e-8y5f (last visited Oct. 18, 2021).

individuals are subject to "different standards to test and to quarantine" than those who

are vaccinated and are ultimately subject to termination under the Policies.  <u>Bauer</u>, ECF

No. 17 at 10.  Upon review, the court fails to see how the Policies impose any testing or

quarantine requirements at all—much less any that treat vaccinated individuals

differently than unvaccinated.  Therefore, this argument offers little support for plaintiffs'

request to enjoin the Policies.

       Although the Policies treat unvaccinated individuals differently than those

vaccinated by only subjecting the former to potential termination, such differential

treatment does not target a suspect class.  In other words, it does not categorize persons

based on suspect classifications, such as race and national origin, or on quasi-suspect

classifications such as gender and illegitimacy.  Accordingly, the court applies rational

basis review, asking whether the government's classification bears a rational relation to

some legitimate end.  <u>See</u> <u>Dixon</u>, 2021 WL 4750187, at *5 (citing <u>Heller v. Doe</u>, 509 U.S

312, 320 (1993)) (noting that because the mayor only sought to distinguish between

vaccinated and unvaccinated individuals, "unless the EEOs overly burden a suspect class

or impinge upon a fundamental right, they are subject to rational basis review.").  To

prevail, plaintiffs must demonstrate that there is no rational basis for the difference in

treatment between them and the vaccinated employees.  <u>See</u> <u>Vill. of Willowbrook v.</u>

<u>Olech</u>, 528 U.S. 562, 564 (2000).  For reasons already discussed, plaintiffs have not done

so.

       Plaintiffs fail to articulate how defendants' differential treatment of vaccinated

and unvaccinated personnel is irrational.  As of August 2021, the CDC reported that

unvaccinated individuals have a 6.1 times greater risk of testing positive for COVID-19

and 11.3 times greater risk of dying from COVID-19 than vaccinated individuals.

CDC, Rates of COVID-19 Cases and Deaths by Vaccination Status,

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last visited Oct. 18,

2021).  Extensive data supports vaccination as an effective strategy for preventing severe

illness, hospitalization, and death from COVID-19.  CDC, COVID-19 Vaccine

Effectiveness, https://covid.cdc.gov/covid-data-tracker/#vaccine-effectiveness (last

visited Oct. 18, 2021).  There is evidence that vaccines provide more robust protection

than antibodies from a previous COVID-19 infection.  Alyson M. Cavanaugh et

al., Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination —

Kentucky, May–June 2021, 70 MORBITY MORTAL WEEKLY REP. 1081–83 (2021),

http://dx.doi.org/10.15585/mmwr.mm7032e1.  Thus, the CDC recommends vaccination

even for individuals who have already been infected with COVID-19 and recovered.

CDC, Frequently Asked Questions about COVID-19 Vaccination,

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html (last visited Oct. 19,

2021).  In light of this evidence, plaintiffs' contention regarding the comparative

immunities of COVID-19-recovered individuals and vaccinated individuals are "of no

moment to the instant analysis, as 'the court doesn't intervene so long as [Defendants']

process is rational in trying to achieve public health.'"  Valdez, 2021 WL 4145746, at

*5–8 (citing Klaassen I, 2021 WL 3073926, at *38 and Phillips v. City of New York, 775

F.3d 538, 542 (2d Cir. 2015)) ("[P]laintiffs argue that a growing body of scientific

evidence demonstrates that vaccines cause more harm to society than good, but as

Jacobson makes clear, that is a determination for the [policymaker], not the individual

objectors.")).  Therefore, the court finds that the Policies, based on reliable science and

medicine, are likely to survive rational basis review such that plaintiffs are unlikely to prevail on an equal protection claim.  See Maniscalco, 2021 WL 4344267, at *5 (finding a rational basis for the difference in treatment among teachers subject to a vaccine mandate and other municipal employees who were not when it would "minimize the need for both students and teachers to miss class due to either infection or quarantine"); Valdez, 2021 WL 4145746, at *9 (internal citation omitted) (finding that an employer's vaccine mandate is "grounded in medicine and science, and thus is rationally related to Defendants' legitimate purpose of protecting our community 'against an epidemic of disease [that] threatens the safety of its members'"); America's Frontline Doctors, 2021 WL 4546923, at *3–5 ("The Court finds that there is clearly a rational basis for Defendants to institute the Policy requiring vaccination, including for individuals who previously had COVID-19.").

### c.  Free Exercise

Plaintiffs' motions perfunctorily claim that the Policies "conflict[] with the United States Constitution's guarantee of . . . free exercise . . . ."  Bauer, ECF No. 17 at 4.  However, plaintiffs fail to provide any law or substantive argument on this claim in their motions for preliminary injunction or replies thereto.  Therefore, plaintiffs have failed to satisfy their burden of showing likelihood of success on the merits of this claim.

To the extent plaintiffs intend their "free exercise" allegation to mean that the Policies impede on their freedom of speech protected under the First Amendment, plaintiffs likewise have failed to show likelihood of success on the merits.  Confusingly, plaintiffs assert within their equal protection argument that the Policies "not only restrict[] free expression of thought and free exchange of ideas, it ultimately restricts

freedom to make medical decisions." Bauer, ECF No. 17 at 11.  To be sure, public

employees do not "relinquish First Amendment rights to comment on matters of public

interest by virtue of government employment." Connick v. Myers, 461 U.S. 138, 140

(1983).  However, in considering whether plaintiffs' First Amendment rights are violated,

> [C]ourts must also consider the government's countervailing interest in
> controlling the operation of its workplaces.  Just as there is a public interest
> in having free and unhindered debate on matters of public importance, the
> efficient functioning of government offices is a paramount public interest.
> Therefore, a public employee by necessity must accept certain limitations
> on his or her freedom.  In particular, under the balancing test developed by
> the Supreme Court in Pickering[ v. Bd. of Educ., 391 U.S. 563, 573 (1968)]
> and Connick[ v. Myers, 461 U.S. 138, 145 (1983)], the First Amendment
> does not protect public employees when their speech interests are
> outweighed by the government's interest in providing efficient and effective
> services to the public.

Grutzmacher v. Howard County, 851 F.3d 332, 342 (4th Cir. 2017) (internal quotation

marks and citations omitted).  Plaintiffs do not articulate the precise idea or statement that

plaintiffs wish to express by virtue of their vaccine opposition and refusal.  In any event,

the court finds that plaintiffs are unlikely to succeed on this claim because their right to

express themselves by refusing the COVID-19 vaccine is outweighed by the

government's interest in protecting their employees and communities from a deadly

infectious disease and providing efficient and effective services to the public.  As

defendants explain, when an employee refuses to receive the COVID-19 vaccine, the

defendant employers risk staffing shortages and other workplace inefficiencies.

Defendants have submitted affidavits outlining these negative impacts and explaining the

financial burden the defendant employers, and by extension taxpayers, have faced to date

in connection with efforts to provide coverage for employees who became sick or needed

to quarantine due to infection.  Moreover, and perhaps more importantly, these defendant

35

employers have reasonably concluded that they risk endangering their employees and the

citizens who receive their services if they allow some employees to report to work

unvaccinated.  Because the vaccine undisputedly reduces the spread of COVID-19, the

government has not only a legitimate interest in limiting its employees' freedom to

express themselves by vaccine refusal, but a compelling one.

Otherwise, plaintiffs assert in a conclusory manner that "Doctor-patient

communication about medical treatment receives substantial protection under the First

Amendment"; "the State cannot commandeer the doctor-patient relationship to compel a

physician to express its preference to the patient"; and "Request for medical treatment is

protected speech." Bauer, ECF No. 17 at 11–12.  The court need not address these half-

baked arguments.  The court will not countenance this so-called "spaghetti approach" to

litigation whereby the parties "heave[ ] the entire contents of a pot against the wall

in hopes that something [will] stick." Indep. Towers of Wash. v. Washington, 350 F.3d

925, 929 (9th Cir. 2003).  Moreover, the court will not attempt to grapple with every hint

of an argument, no matter how poorly developed; as the Fourth Circuit has now

repeatedly explained, judges "are not like pigs, hunting for truffles buried in briefs.

Similarly, it is not our job to [] make arguments for either party." Hensley v. Price, 876

F.3d 573, 581 (4th Cir. 2017).

### 2.  State Law Claims

Plaintiffs additionally claim that the Policies violate (1) the South Carolina

Constitution's guarantee of free expression, (2) South Carolina's Home Rule Act, (3) the

Department of Health and Environmental Control ("DHEC") General Supervision of

Vaccination, Screening, and Immunization, (4) the common law prohibition against

wrongful discharge, and (5) the right to privacy under the South Carolina Constitution. Upon review, the court finds that none of these claims warrant the imposition of a temporary injunction.

### a.    South Carolina Constitution's Guarantee of Free Expression

It is unclear from plaintiffs' motions and replies precisely what argument plaintiffs attempt to make by invoking the "guarantee of free expression" in the South Carolina Constitution.  As the court can best construe plaintiffs' briefings, plaintiffs are simply asserting the same arguments regarding freedom of speech and freedom to express their opposition to the COVID-19 vaccine discussed supra, but under the South Carolina, rather than the United States, Constitution.  For reasons already explained, plaintiffs are unlikely to succeed on such a claim under federal law, and plaintiffs do not argue that the court's analysis of any freedom of speech or expression claim should differ under state law.  Accordingly, the court likewise finds that plaintiffs are unlikely to succeed on their state law claim that the Policies impermissibly restrict their freedom of expression.[9]

---

[9] Plaintiffs also confusingly appeal to the South Carolina "law protecting the free exercise of religion." Bauer, ECF No. 17 at 13.  Specifically, plaintiffs argue that "'[a] test of compelling state interest will be imposed on all state and local laws and ordinances in all cases in which the free exercise of religion is substantially burdened' and provides 'a claim or defense for those whose exercise of religion is substantially burdened by the State.'" Id. (citing S.C. Code Ann. § 1-32-30).  The court can locate no such claim in plaintiffs' complaints or, where applicable, amended complaints.  Plaintiffs cannot show likelihood of success on claims not included in their complaints.  To the extent plaintiffs attempt to make this argument under their asserted freedom of expression claims, plaintiffs have failed to meet their burden of showing likelihood of success on such a claim.  Plaintiffs cite no case law and otherwise make no argument to satisfy this court that the Policies substantially burden a person's exercise of religion.  Plaintiffs cannot carry their burden with the bare assertion that the Policies substantially burden their exercise of religion.  Indeed, plaintiffs fail to explain which religion, if any, is incompatible with the Policies.  In any event, the Policies provide a religious exemption for a "sincerely held religious belief, practice, or observance" that conflicts with the

37

### b.  South Carolina's Home Rule Act

Plaintiffs next argue that the Policies contravene South Carolina's Home Rule Act.  To the court's dismay, plaintiffs do not provide the court any law regarding the Home Rule Act—much less properly apply the facts of the instant cases to that law.  It appears that plaintiffs' argument here is generally that defendants exceeded their authority in issuing the Policies.  However, it is otherwise unclear precisely how plaintiffs allege that defendants exceeded their authority.  For example, in the context of this argument, plaintiffs assert that "the mandate issued by the North Charleston mayor substantially burdens religious freedom and bodily autonomy, and circumvents the scrutiny such a rule would be afforded had it been debated at the level necessary for adoption of a state law or even a local ordinance."  Bauer, ECF No. 17 at 16.  The court has already addressed plaintiffs' allegations regarding religious freedom and bodily autonomy and need not consider plaintiffs' repackaging of those arguments under this claim.  Moreover, whether the vaccine mandate would have received greater "scrutiny" had it been debated at the state law or local ordinance level is irrelevant.

Plaintiffs cite to no provision of the Home Rule Act—or any other law—that requires that the Policies receive any greater public or governmental scrutiny than defendants provided.  For example, the City of North Charleston has a Mayor-Council form of government subject to the provisions of Chapter 9 of the Home Rule Act.  Under that chapter, Mayor Summey has the power and duty to "direct and supervise the

_____

order.  See, e.g., Bauer, ECF No. 4 at 3–4.  Plaintiffs fail to clearly show how the Policies substantially burden their free exercise of religion notwithstanding these religious exemptions.  Therefore, the court finds that plaintiffs have not shown they are likely to prevail on this claim.

administration of all departments, offices and agencies of the municipality," and he also has the authority, "when he deems it necessary for the good of the municipality," to remove any municipal employee. S.C. Code Ann. §§ 5-9-30(1) and (2). Plaintiffs fail to cite any authority or otherwise persuade the court that they are likely to prove that Mayor Summey's implementation of the Executive Order exceeds those powers. Although plaintiffs may have preferred that the vaccine mandates be subject to "[o]pen debate between elected officials," rather than be enacted pursuant to an administrative directive authorized by Mayor Summey or pursuant to personnel policies issued by the other defendant employers, plaintiffs fail to cite any authority requiring such open debate. Bauer, ECF No. 17 at 16. As such, the court finds that plaintiffs have not met their burden for a preliminary injunction based on this claim.

### c. DHEC's General Supervision of Vaccination, Screening, and Immunization

As the court can best construe it, plaintiffs' claim relating to S.C. Code Ann. § 44-29-40 is that the state of South Carolina delegated the power to mandate vaccines to DHEC and gave DHEC sole authority to promulgate regulations relating to vaccinations. Plaintiffs contend that defendants, in mandating that plaintiffs receive COVID-19 vaccines as a condition of their employment, usurped DHEC's authority such that the Policies conflict with state law.

Under § 44-29-40,

The Department of Health and Environmental Control shall have general direction and supervision of vaccination, screening, and immunization in this State. The Department of Health and Environmental Control has the authority to promulgate regulations concerning vaccination, screening, and immunization requirements.

S.C. Code Ann. § 44-29-40.  Plaintiffs have not made a clear showing that they are likely

to prevail on this claim.  On its face, the statute does not provide that DHEC has

<u>exclusive</u> authority to enact regulations concerning vaccination.  It likewise does not

prohibit employers from enacting more restrictive vaccination requirements than DHEC.

DHEC's own interpretation of its authority is consistent with a finding that § 44-29-40

does not grant it sole authority on all vaccination matters.  When asked about its position

regarding employer vaccine mandates, DHEC officials released the following statement:

> As background, DHEC does not provide guidance concerning requiring
> COVID-19 vaccinations. Decisions about individual requirements are best
> determined by employers. DHEC does encourage COVID-19 vaccinations
> for all eligible residents. These vaccines are safe, effective and are the
> number one way for South Carolina and the rest of the nation to end this
> pandemic once and for all.

<u>Bauer</u>, ECF No. 14-5.  In light of this official statement and plaintiffs' arguments before

the court, the court cannot find that plaintiffs are likely to succeed in proving that

defendants usurped DHEC's general supervisory vaccination authority in issuing the

Policies.[10]

---

[10] Plaintiffs also argue that the Policies are in direct contravention of Governor
Henry McMaster's executive order 2021-23, which states that "the State will not mandate
that South Carolinians receive such vaccines."  Exec. Order No. 2021-21 (May 1, 2021),
https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2021-05-
11%20FILED%20Executive%20Order%20No.%202021-23%20-
%20Emergency%20Measures%20Regarding%20Face%20Coverings%20Vaccine%20Pa
ssports%20%20Other%20Matters.pdf (last visited Oct. 13, 2021).  It is unclear under
which cause of action asserted in plaintiffs' complaints this argument falls.  In any event,
plaintiffs are unlikely to prove the Policies are unlawful on this basis.  While the
governor's executive order noted that the state of South Carolina would not mandate that
all South Carolinians receive the COVID-19 vaccination, it did not prohibit any other
person, entity, or official from doing so.  The lack of an express prohibition on vaccine
mandates in the executive order is significant, particularly in light of other express
prohibitions set forth in Governor McMaster's executive order.  For example, in the
executive order, Governor McMaster explicitly states, "I hereby prohibit any agency,
department, official, or employee of the State of South Carolina, or any political

### d. Wrongful Discharge

Finally, plaintiffs argue that their termination for vaccine refusal pursuant to the

Policies would amount to wrongful discharge for their political beliefs.  As previously

mentioned, plaintiffs argue that South Carolina recognizes a public policy exception to

at-will employment.  Specifically, under S.C. Code Ann. § 16-17-560, it is "unlawful for

a person to . . . discharge a citizen from employment or occupation . . . because of

political opinions or the exercise of political rights and privileges guaranteed to every

citizen by the Constitution and laws of the United States or by the Constitution and laws

of this State."  As discussed in the context of plaintiffs' due process claims, plaintiffs

explain that they "do not agree with [the COVID-19 vaccine] politically," and their

vaccine refusal is "expressive speech in the form of opposition to the COVID-19 vaccine,

and expressive conduct in opposition to the vaccine mandate."  Bauer, ECF No. 4 at 3–4.

Therefore, plaintiffs argue that termination based on the Policies' vaccine mandates

amounts to termination for a political belief.

Plaintiffs have not shown they are likely to prevail on this claim for two reasons.

First, plaintiffs' claim relies on the mistaken assumption that § 16-17-560 extends to all

opinions and expressions protected under the First Amendment of the United States

Constitution (or the Constitution of the state of South Carolina).  However,

"the political opinion and expression covered by section 16–17–560 extends only to

matters directly related to the executive, legislative, and administrative branches of

---

subdivision thereof, from developing, issuing, or requiring presentation of a Vaccine
Passport, as further defined herein."  Id.  In light of the express prohibitions enumerated
in the governor's executive order, the court declines to read Governor McMaster's
statement that the "State will not mandate" that South Carolinians receive COVID-19
vaccines as a prohibition on similar employer-implemented mandates.

Government, such as political party affiliation, political campaign contributions, and the right to vote." See Vanderhoff v. John Deere Consumer Prod., Inc., 2003 WL 23691107, at *2 (D.S.C. Mar. 13, 2003) (referencing Culler, 422 S.E.2d at 92–93).  Plaintiffs cite no evidence whatsoever in support of the notion that vaccination status is tied to a particular political belief, much less one related to the executive, legislative, and administrative branches of government.  Plaintiffs likewise cite no authority or caselaw to suggest that South Carolina courts would recognize vaccine refusal as a "political belief" subject to any public policy exception to at-will employment.  The court finds that plaintiffs' vaccine refusal likely is not the type of politically-based belief or opinion contemplated by § 16-17-560, and plaintiffs fail to make a clear showing to the contrary.

  Second, the public policy exception to at-will employment does not apply when "the employee has an existing remedy for a discharge that allegedly violates rights other than the right to the employment itself." Epps, 405 S.E.2d at 387.  In this case, plaintiffs claim that their discharge would violate their constitutional rights, not just their right to employment.  The United States Supreme Court has recognized § 1983 as a viable method for aggrieved public at-will employees to bring claims for damages from employment decisions that violate the United States Constitution.  See generally Rutan v. Republican Party of Ill., 497 U.S. 62 (1990).  And, the South Carolina Supreme Court has found that, in the context of the public policy exception, § 1983 is an existing remedy that bars an employee from alleging that his discharge violated his constitutional rights under the public policy exception.  Epps, 405 S.E.2d 386.  Plaintiffs have asserted § 1983 claims in this action and therefore cannot clearly show likelihood of success on a wrongful discharge claim.

Finally, even if "political opinions" or "political rights" encompass vaccine refusal and plaintiffs did not have an existing legal remedy, plaintiffs have not clearly shown that the termination provisions in the Policies are based on their political opinions or beliefs.  On the contrary, defendants have presented substantial evidence that the Policies are based not on the fact that plaintiffs hold a certain belief regarding vaccination, but rather on the legitimate threat that their unvaccinated condition poses to public safety and effective governmental operations.  Therefore, plaintiffs have not shown that they are likely to succeed in proving wrongful discharge based on their political beliefs.

### e.  South Carolina's Right to Privacy

Plaintiffs do no more than merely reference the right to privacy under Article I, § 10 of the South Carolina Constitution in their briefings on the motions for preliminary injunctions.  See, e.g., Bauer, ECF No. 8 at 14.  Despite the fact that the South Carolina right to privacy is not mentioned anywhere in plaintiffs' complaints and despite providing the court little to no substantive argument on the matter prior to the hearing, counsel for plaintiffs' oral argument at the hearing surprisingly focused heavily, if not primarily, on the South Carolina right to privacy.  As the court has already observed, plaintiffs cannot show likelihood of success on the merits of a claim that is not asserted in their complaints.  However, affording defendants the benefit of every doubt, the court nevertheless briefly addresses plaintiffs' argument regarding the South Carolina right to privacy.

Article I, § 10 of the South Carolina Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and <u>unreasonable invasions of privacy shall not be violated</u> . . . ." S.C. Const. art. I, § 10 (emphasis added).  The South Carolina Supreme Court has defined the "right to privacy" as the right of an individual to be let alone and to live a life free from unwarranted publicity.  <u>Sloan v. S.C. Dep't of Pub. Safety</u>, 586 S.E.2d 108 (S.C. 2003).  However, "'one of the primary limitations placed on the right of privacy is that it does not prohibit the publication of matter [sic] which is of legitimate public or general interest.'"  <u>Soc'y of Pro. Journalists v. Sexton</u>, 324 S.E.2d 313, 315 (S.C. 1984) (quoting <u>Meetze v. Associated Press</u>, 95 S.E.2d 606 (S.C. 1956)).  Indeed, the South Carolina Supreme Court has held that, as a matter of law, "if a person, whether willingly or not, becomes an actor in an event of public or general interest, 'then the publication of his connection with such an occurrence is not an invasion of his right to privacy.'"  <u>Doe v. Berkeley Publishers</u>, 496 S.E.2d 636, 637 (S.C. 1998) (quoting Meetze, 95 S.E.2d at 609).

As the court has discussed throughout its order, efforts to reduce the spread of COVID-19 and thereby ensure effective and efficient government operations are matters of legitimate public and general interest.  As such, defendants' efforts to further these interests do not invade on plaintiffs' right to privacy.  In this regard, the instant action differs from the facts of the single case plaintiffs cite in support of their South Carolina right to privacy argument, <u>Singleton v. State</u>, 437 S.E.2d 53, 61 (S.C. 1993).  In <u>Singleton</u>, the Supreme Court of South Carolina considered whether an incompetent inmate on death row could receive forced medication solely to facilitate his execution.

The court held that "Federal due process and our own South Carolina Constitution require that an inmate can only receive forced medication where the inmate is dangerous to himself or to others, and then only when it is in the inmate's best medical interest." Singleton, 437 S.E.2d at 61.  Similar to the federal due process cases involving forced medical treatment of inmates discussed previously, Singleton is inapposite to this action. Here, defendants have concluded, based on the scientific evidence as it stands, that unvaccinated employees present a danger to themselves and others in the current climate of the pandemic.  Moreover, plaintiffs have not explained how it is not in their medical best interests to receive the vaccine, and to the extent that it is not, the Policies provide for medical exemptions.  Under these circumstances, the holding in Singleton does not suggest that the vaccine mandates in the Policies implicate the South Carolina right to privacy.[11]  Moreover, as the court has already explained, plaintiffs are not imprisoned and being forced to receive medication against their will.  Therefore, even if plaintiffs asserted a claim for violation of the South Carolina right to privacy, the court does not find that plaintiffs have made a clear showing of likelihood of success on such a claim.

Overall, plaintiffs have not met their burden of clearly showing likelihood of success on any of their federal or state law claims.  Therefore, plaintiffs' requests for preliminary injunctions fail at the first prong of the Winter test.

---

[11] If vaccine mandates did implicate the right to privacy in South Carolina, plaintiffs fail to explain how the widely accepted vaccine requirements for school children do not violate that right but the employer COVID-19 mandates under the Policies somehow do.

### B.   Irreparable Harm

Since plaintiffs' arguments on the likelihood of success on the merits fail, the

remaining factors need only be addressed briefly.  The second prong of the <u>Winter</u> test—

irreparable harm—is an "indispensable" requirement for a preliminary injunction, and in

the absence of irreparable harm, injunctive relief cannot be granted.  <u>D.T. v. Sumner</u>

<u>Cnty. Schs.</u>, 942 F.3d 324, 326 (6th Cir. 2019).  In plaintiffs' view, the Policies leave

them with effectively two options: receive the COVID-19 vaccine and give up their

constitutionally protected rights to bodily autonomy and privacy, or refuse to receive

the COVID-19 vaccine and risk losing their jobs, a constitutionally protected property

interest.  As such, plaintiffs argue that in either option, their constitutional rights will be

infringed upon, causing them irreparable harm.  The court disagrees and finds that

plaintiffs have failed to show that irreparable harm will result in the absence of injunctive

relief, weighing heavily against the grant of such relief.

First, for an injury to be irreparable, the injury resulting from the denial of

injunctive relief cannot be "fully compensable by monetary damages."  <u>Overstreet v.</u>

<u>Lexington-Fayette Urb. Cnty. Gov't</u>, 305 F.3d 566, 578 (6th Cir. 2002).  "Mere injuries,

however substantial, in terms of money, time and energy necessarily expended in the

absence of a stay, are not enough.  The possibility that adequate compensation or other

corrective relief will be available at a later date, in the ordinary course of litigation,

weighs heavily against a claim of irreparable harm."  <u>Sampson v. Murray</u>, 415 U.S. 61,

90 (1974); <u>see</u> <u>Winter</u>, 555 U.S. at 22.  As such, loss of employment is not considered to

be an irreparable injury because it is fully compensable by monetary damages.  <u>See,</u>

<u>e.g.,</u> <u>Seery v. DePuy Orthopaedics, Inc.</u>, 2014 WL 12609705, at *1 (D.S.C. Dec. 23,

2014) (finding that loss of income payments "are easily calculated and compensated; they are not irreparable"); Hayes v. City of Memphis, 73 F. App'x 140, 141 (6th Cir. 2003). In fact, wrongful discharge claims exist for that very reason—whether brought under state or federal law, a wrongfully terminated plaintiff can receive monetary damages to compensate for their loss of employment.  Therefore, plaintiffs fail to make a clear showing of irreparable harm based on their loss of employment under the Policies.  See Valdez, 2021 WL 4145746, at *12 (finding that being "terminated/prevented from working as a nurse [under a vaccine mandate] does not equate to irreparable harm").  Indeed, at least two other federal district courts have explicitly held that loss of employment due to non-compliance with a COVID-19 vaccine mandate does not constitute irreparable harm.  See id.; Norris, 2021 WL 3891615, at *3.

Second, as discussed in detail supra, plaintiffs' alleged constitutional injuries do not amount to irreparable harm.  "[W]hen a plaintiff seeks injunctive relief based on an alleged constitutional deprivation, 'the two prongs of the preliminary injunction threshold merge into one . . . in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.'"  Page v. Cuomo, 478 F. Supp. 3d 355, 364 (N.D.N.Y. 2020) (quoting Turley v. Giuliani, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)).  For reasons previously stated, plaintiffs have not clearly shown that the harm they are facing is the result of constitutional violations.  Therefore, the irreparable harm factor weighs against granting a preliminary injunction.  See Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d 1100, 1160–64 (D.N.M. 2020); Antietam Battlefield KOA v. Hogan, 461 F. Supp. 3d 214, 242 (D. Md. 2020), appeal dismissed, 2020 WL 6787532 (4th Cir. July 6, 2020).

### C. Balance of Equites and Public Interest

Finally, the balance of equities and public interest prongs of the Winter test tip in defendants' favor.  "[C]ourts must balance the competing claims of injury on each party of either granting or withholding the requested relief, paying particular regard to the public consequences."  Winter, 555 U.S. at 22.  It is clear that, through the Policies, defendants are promoting a strong public interest—combatting the spread of COVID-19, a virus that has infected and taken the lives of thousands of South Carolina residents and disrupted not only defendants' effective provisions of services but societal operations in general.  No matter any individual's stance on COVID-19, every person, including plaintiffs in these cases, can agree that ending the COVID-19 pandemic is in the public's collective best interest for purposes of balancing equities.  See Perez-Perez v. Adducci, 459 F. Supp. 3d 918, 931 (E.D. Mich. 2020) ("Society benefits by stemming the proliferation of COVID-19, thereby 'flattening the curve,' preventing strain on medical centers and hospitals, and ultimately reducing death or long-term injury from COVID-19-related lung damage."); see also Neinast v. Bd. of Trs., 346 F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests); Thakker v. Doll, 451 F. Supp. 3d 358, 372 (M.D. Pa. 2020) ("Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest . . . ."); Kheriaty, 2021 WL 4714664, at *9 (holding that efforts to protect a campus community of more than half a million students, faculty, and staff from a deadly infectious disease "far outweigh[]" the harm of employer-mandated vaccination).  Plaintiffs' requested relief here would weaken the efforts of defendants to carry out that goal.  As such, enjoining the Policies is not in the public interest.  See Bruesewitz v. Wyeth LLC, 562 U.S. 223,

226 (2011) (internal quotations omitted) (describing "the elimination of communicable diseases through vaccination" as "one of the greatest achievements of public health in the 20th century").

To be sure, plaintiffs who oppose vaccination may be harmed by the Policies—whether by termination or by their reluctant submission to vaccination to retain their jobs. But defendants' "interest in combatting COVID-19 is at least equally [as] significant" as the harm plaintiffs face in choosing between receiving a medically-approved vaccination or suffering employment-related consequences. Columbus Ale House, Inc. v. Cuomo, 495 F. Supp. 3d 88, 94 (E.D.N.Y 2020) (quoting League of Indep. Fitness Facilities, 814 F.App'x at 129). While plaintiffs may remain unvaccinated at their own risk, the balance of equities and public interest do not require defendants to allow plaintiffs to spread that risk in their workplace and, by extension, into the communities they serve. Reasonable minds may disagree on the public health consequences of the Policies. For example, plaintiffs suggest that there has been a "precipitous decline in cases" without any imposed vaccine mandates. Bauer, ECF No. 17 at 22 (emphasis omitted). However, "[w]here good faith arguments can be made on both sides of the many issues raised by the pandemic," it is up to local government and employers, "not the courts, to balance the competing public health and business interests." Columbus Ale House, 495 F. Supp. 3d at 95. Based on the competing interests identified, the court finds that plaintiffs have failed to make a clear showing that the balance of harms weighs in their favor or that granting the requested injunction best serves the public interest. See ETP Rio Rancho Park, 2021 WL 765364, at *57 (holding that "the threatened injuries—financial injuries and possible permanent business closure—do not outweigh possible damage—

49

increased COVID-19 spread leading to sickness, hospitalizations, and death—to the Defendants," and "for similar reasons," the requested injunction "would be adverse to the public interest"); Dixon, 2021 WL 4750187, at *14; Maniscalco, 2021 WL 4344267, at *4; Valdez, 2021 WL 4145746, at *13.

In light of plaintiffs' failure to show that their claims are likely to be meritorious, the balance of hardships that weighs in defendants' favor, and the strong public interest that weighs against enjoining the Policies, the court finds that a preliminary injunction is not appropriate in this case. In denying plaintiffs' motions, this court is not impugning either the integrity or the sincere nature of plaintiffs' beliefs. However, it is not the court's role to determine and impose the employer policies that best strike the balance of the competing interests of a pandemic that has plagued not just this state or country, but the world, for almost two years. Irrespective of politics, the court has evaluated and analyzed the law and the legal arguments raised by both sides. Unfortunately for plaintiffs, they have not stated a viable legal theory in support of an injunction, as each of the factors required to be considered, individually and collectively, weigh against the grant of injunctive relief.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the motions for preliminary injunction in each of the above-captioned cases.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 21, 2021**
**Charleston, South Carolina**